Filed 4/9/26  P. v. Espino CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E083132 |
| v. | (Super.Ct.No. INF1801390) |
| MIGUEL ANGEL ESPINO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Francisco Navarro, Judge.  Affirmed.

Benjamin Kington, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Adrian R. Contreras, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Miguel Angel Espino of attempted premeditated murder, aggravated mayhem, and arson.  (Pen. Code, §§ 187, 205, 451, subd. (b), 664; unlabeled

1

statutory citations refer to this code.) The victim of the offenses was Espino's father, A.E. (Father). Espino argues that (1) the trial court erred by failing to instruct the jury on the "heat of passion" theory of attempted voluntary manslaughter (§ 192, subd. (a)) and (2) his trial counsel rendered ineffective assistance by failing to request an instruction on voluntary intoxication. He also argues that the court did not conduct a sufficient inquiry into defense counsel's motion for new trial based on counsel's own ineffectiveness. Espino asserts that we must remand for the court to conduct a further inquiry into the claim of ineffective assistance. We affirm.

## BACKGROUND

I.    *Trial evidence*

Espino lived in a trailer with Father in August 2018. Espino's mother had moved out of the trailer three or four months earlier. She found it difficult to live there and "was in a lot of fear." Father was an alcoholic and "would bring a lot of people to the house," and Espino used drugs and often argued with Father. Father verbally abused and insulted Espino, and he also threw "whatever he could find" at Espino.

One morning, a neighbor saw Espino and Father arguing and yelling at each other in the street. Espino's brother spoke to Father on the phone that evening, and Father said that Espino was outside barbecuing. Roughly 30 minutes later, at around 7:00 p.m., Espino's friend arrived at the trailer and smelled smoke. She opened the door and saw smoke coming from the area where the bedrooms were. The friend ran towards the smoke and found Father lying on the floor in the hallway. Father had blood on his head, and there were flames near his head and shoulder. The friend smelled burning flesh. She

2

talked to Father to try to keep him conscious, but Father did not respond. The friend grabbed the garden hose from outside, tried to extinguish the fire, and told a neighbor to call 911.

Father was taken to the hospital, where he was treated for his injuries. He had multiple lacerations on his head, and he suffered a "near complete amputation of the right external ear." The ear was "severely injured" and "appear[ed] similar to minced meat." Father also had a burn wound on his right shoulder, an incised wound on his arm, and wounds on his fingers, including near "traumatic amputations" of fingers. The wounds on Father's fingers appeared to be defensive. His head wounds were consistent with being hit with the claw end of a hammer.

In the trailer, officers found a hammer and a five-pound rock in the kitchen, and there was blood on both objects. The DNA profile of the blood on the hammer and the rock matched Father, and Espino was excluded as the source of the DNA.

A fire investigator found a partially burned pile of paper, wood, and fabrics in the hallway of the trailer. There was also a bottle of rubbing alcohol, or isopropyl alcohol, in the same area of the hallway and burned matches in the kitchen. Isopropyl alcohol is an ignitable liquid and a fire accelerant. The fire investigator used a combustible gas detector to determine whether there were any vapors in the air from an ignitable liquid. The device alerted to the presence of such vapors in the 12 inches around the bottle of isopropyl alcohol. An officer collected Father's clothing from the hospital, and the fire investigator also tested Father's clothing with the combustible gas detector; the device

3

alerted on the clothing. The investigator opined that the trailer fire originated in the area of the isopropyl alcohol and that it was "an incendiary-caused fire."

Espino approached the trailer at roughly 1:45 a.m. and was detained by officers investigating the crime scene. Espino did not have any injuries except a small cut on his forehead. Officers interviewed Espino twice. The first interview was at 3:30 a.m., shortly after his arrest. Espino was evasive and appeared confused. He said that he had not seen Father for two days and denied doing anything to Father. The officers did not mention a hammer or a rock during that interview.

Later that day, at 12:30 p.m., Espino left a voicemail for his mother asking about Father and stating: "I want to know if he's still alive and well—you already know how it went, how things are and he wanted well—he wanted to he wanted to kill me well I panicked and, well—and, well, you know, mom. I got there, well—these things happen, but I don't know why the fuck he wanted to kill me, well, why did he take the fucking knife out and he did he did it like that and, well—I didn't think at the time. And, well, he grabbed the stone, he wanted to throw it at me, so then I threw it back and then he grabbed the hammer (unintelligible) back and, well. But I—I didn't do it on purpose with bad intentions, mom. I did it to protect myself too."

In a recorded jailhouse call several hours later, Espino told his mother that Father tried to kill him. Espino asked, "Does he know it was me?" His mother said that Espino was the only suspect. Espino also asked if "[e]verything go[t] burned," and his mother replied that only part of the trailer burned. She told him that Father had burn injuries, and

4

Espino asked how bad those injuries were. She replied, "Well, don't you know what you did to him?" He responded, "No, well I wasn't there."

The next day, officers interviewed Espino for the second time. Espino said that he found Father on the floor of the trailer "bleeding to death," but he left once the firefighters arrived. He did not want to be blamed "for something [he] didn't do," and he did not know why someone would have started the fire. He said that he was mad and left to search for the perpetrator.

Espino's uncle described the relationship between Espino and Father as "toxic." Roughly two months before the fire, the uncle witnessed a fight between Espino and Father. Father was screaming at Espino, and Espino was pulling and pushing Father. Espino was "being a little bit aggressive." Father screamed for help, so the uncle called the police. The uncle had heard Father call Espino insulting names on five to eight occasions, and Espino would call Father names in return.

Espino's mother obtained a temporary restraining order against Espino in May or June 2018, a few months before the charged incident. In the request for the restraining order, Espino's mother stated that Espino threatened her, attacked her husband, destroyed her house, and threatened to destroy other property. The order identified both her and Father as protected partes.

One of Espino's neighbors told an investigator that on a prior occasion, she had seen Espino break the trailer windows with his hands. Another neighbor told an investigator that during a prior fight with Father, Espino dragged a mattress out of the trailer and tried to light it on fire.

5

Espino testified in his own defense. Father often picked fights with Espino and often "talk[ed] shit" to him. Espino felt angry and upset when Father insulted him. It would "get [his] blood boiling" and make him "lose [his] mind."

Espino was using multiple drugs in the month or so before the charged incident, including PCP, methamphetamine, heroin, and fentanyl. On the day of the charged incident, he and Father were preparing to barbecue. Espino smoked some PCP with marijuana and then went to grab the food that they were going to cook. He did not close the refrigerator door securely, and the door hit Father in the back of the head. Father thought that Espino had done it on purpose, got mad, and "started losing it." Father hit Espino with "anything he [could] grab." Espino explained: "And from that point on, I just started seeing a blur. I started hitting stuff because I was having trouble hearing the devil in my mind and a bunch of demons were, like, having control of me at the time, and kind of still do when I go to sleep at night." Father pulled a knife at some point and gave Espino a small cut on his forehead. That small cut was the only injury that Father inflicted. Espino was "delusional" and thought he saw Father as "the devil." Espino "literally thought [Father] would try to kill" him because Espino "was drugged out of [his] mind." He did not remember lighting the fire, and he does not know how the fire happened. He also did not remember hitting Father on the head with the hammer or the stone. He did not "know how this happened"; he just knew that he "was being attacked." Father probably called him names, but he could not recall anything specific that Father said.

When the officers first interviewed Espino, he did not remember attacking Father. He did not recall his first interview with the officers because he was "high" at the time, nor could he recall his second interview. He also did not remember his voicemail to his mother or the jailhouse call with her. He started to remember the incident with Father about one year after it happened.

Espino's two sisters also testified in his defense. According to them, Father was verbally abusive. Father called Espino a "worthless piece of shit," criticized him for not working, and told him that he would never amount to anything. Father also kicked Espino in the legs twice, and he threw a can of beer at Espino. On several occasions, Father pointed a pocket knife at Espino and said, "[T]his is what you're going to get if you don't get your shit together." The sisters were not present during the charged incident.

II.    *Verdict and sentence*

The jury found Espino guilty of attempted premeditated murder, aggravated mayhem, and arson of an inhabited structure. (§§ 187, 205, 451, subd. (b), 664.) In connection with the attempted murder count, the jury found that Espino personally inflicted great bodily injury on Father. (§ 12022.7, subd. (e).) In connection with the attempted murder and aggravated mayhem counts, the jury found that Espino personally used a deadly weapon. (§ 12022, subd. (b)(1).) And in connection with the arson count, the jury found that Espino used an accelerant. (§ 451.1, subd. (a)(5).) The court sentenced Espino to a 10-year determinate term in prison plus another seven years to life.

7

DISCUSSION

I.      *Instruction on "heat of passion" voluntary manslaughter*

Espino argues that the trial court prejudicially erred by denying his request to instruct the jury on the heat of passion theory of attempted voluntary manslaughter. We agree that the court erred by failing to give the requested instruction, but the error was harmless beyond a reasonable doubt.

A.      *Additional background*

Espino asked the court to instruct the jury with CALCRIM No. 603, "Attempted Voluntary Manslaughter: Heat of Passion—Lesser Included Offense." He also requested that the court give CALCRIM No. 604, which instructs jurors on the imperfect self-defense theory of attempted voluntary manslaughter. The court denied the request to give the heat of passion instruction, ruling: "So specifically, I think the big distinction between self-defense and the heat of passion instruction is whether there was some evidence that provoked the defendant. That's different than having to protect himself or others. [¶] And that's what I'm struggling with. I've heard no evidence from the defense as to what the specific facts are that would allow—that would justify this provocation instruction being given. I think many of the arguments that you're making, [defense counsel], you can still make under—we'll get to this in a second, but you can still make this under a theory of self-defense. [¶] But at this point regarding any evidence of provocation, any evidence that there was some sudden quarrel that inflamed the defendant's passion that explains his conduct, I'm just not seeing it."

8

The court concluded that there was some evidence to support the imperfect self-defense instruction, because there was some evidence that there was a physical altercation and that Father "came at [Espino] with a knife." The court therefore instructed the jurors on imperfect self-defense and lawful self-defense (CALCRIM No. 3470).

B.    *Error*

"Manslaughter is a lesser included offense of murder." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).) The "trial court must instruct on a lesser included offense if substantial evidence exists indicating that the defendant is guilty only of the lesser offense." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584 (*Manriquez*).) "'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could . . . conclude[]"' that the lesser offense, but not the greater, was committed." (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*), disapproved on another ground by *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7 (*Schuller*).) "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight" (*Breverman*, at p. 177) and thus does "not evaluate the credibility of witnesses" (*id.* at p. 162). We independently review whether the trial court should have instructed on a lesser included offense. (*Manriquez*, at p. 584.)

One type of voluntary manslaughter is "a killing without malice 'upon a sudden quarrel or heat of passion.'" (*Beltran*, *supra*, 56 Cal.4th at p. 947, quoting § 192, subd. (a).) "Heat of passion is a mental state that precludes the formation of malice and

reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, "'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'" [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*Beltran*, at p. 942, footnote omitted.)

"The provocative conduct by the victim may be physical or verbal." (*Manriquez*, *supra*, 37 Cal.4th at p. 583.) In addition, the "passion aroused need not be anger or rage, but can be any ""[v]iolent, intense, high-wrought or enthusiastic emotion"'" [citation] other than" a desire for revenge. (*Breverman*, *supra*, 19 Cal.4th at p. 163.) Fear or panic may be the emotion that causes a person to act in the heat of passion. (*People v. Dominguez* (2021) 66 Cal.App.5th 163, 180 (*Dominguez*).)

Another theory of voluntary manslaughter is "a killing in the actual but unreasonable belief in the need for self-defense," or "imperfect self-defense." (*Beltran*, *supra*, 56 Cal.4th at p. 951.) Imperfect self-defense "'obviates malice because that most culpable of mental states "cannot coexist" with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand.' [Citation.] A killing in imperfect self-defense constitutes, by definition, unreasonable conduct because the belief in the need to defend is not reasonable. The killing is nevertheless mitigated because of the defendant's misguided but good faith belief. Thus, the societal recognition of mitigation is the same. In both heat of passion and imperfect self-defense

scenarios, the killer who acts unreasonably commits a crime. Yet the degree of culpability is reduced from murder to manslaughter. Adequate provocation or an unreasonable but good faith belief in the need to defend operates on the killer's mental state to prevent the formation of malice." (*Ibid*.)

The two theories of voluntary manslaughter—imperfect self-defense and heat of passion—have significant differences. "For example, a defendant's cool calculation to use deadly force in the face of a threat will defeat a heat-of-passion voluntary manslaughter theory." (*Dominguez*, *supra*, 66 Cal.App.5th at p. 181.) But the two theories "are not mutually exclusive" and "are closely related." (*Id.* at pp. 180-181.) "The victim's conduct that justifies the use of some force in self-defense will often be the reasonable provocation that causes a defendant to lose self-control in the heat of passion." (*Id.* at p. 181.) Thus, "[i]f there is substantial evidence that the defendant killed with a good faith but unreasonable belief in the need for self-defense, *and also* that the defendant killed because his reason was obscured by passion in response to the victim's objectively provocative conduct, the trial court should instruct on voluntary manslaughter under *both* unreasonable self-defense and heat of passion theories." (*Ibid.*)

The record contains substantial evidence from which reasonable jurors could find that Espino attempted to kill Father in the heat of passion, so the court erred by denying the request to instruct on the theory. According to Espino's testimony, Father got mad because he thought that Espino intentionally hit him with the refrigerator door. Father "los[t] it" and hit Espino with "anything he [could] grab," and he also pulled a knife and gave Espino a small cut on the forehead. Espino "started seeing a blur" and "started

11

hitting stuff." In his voicemail to his mother, Espino said that Father wanted to kill him, and Espino panicked. He said that Father wielded a knife, a stone, and a hammer, and Espino acted to protect himself. On the basis of the foregoing evidence, reasonable jurors could conclude that Espino's "reason was obscured by [panic or fear] to such an extent as would cause an ordinarily reasonable person to act rashly and without reflection." (*People v. Barton* (1995) 12 Cal.4th 186, 202; see *Dominguez*, *supra*, 66 Cal.App.5th at p. 175 ["a defendant's 'immediate fear and panic' can, in an appropriate case, provide evidence from which 'a reasonable jury could infer that defendant was aroused to passion, and his reason was thus obscured'"]; *In re Hampton* (2020) 48 Cal.App.5th 463, 480-481 [in addition to lawful self-defense and imperfect self-defense instructions, heat of passion instruction was supported by evidence of a struggle between the defendant and the murder victim in which the victim appeared to reach for a gun].)

C. *Harmlessness*

Nevertheless, the failure to instruct on the heat of passion theory of voluntary manslaughter was harmless. If heat of passion is at issue, then the malice element of murder requires the People to prove beyond a reasonable doubt that the killing was not done in the heat of passion. (*People v. Rios* (2000) 23 Cal.4th 450, 462; see *Schuller*, *supra*, 15 Cal.5th at p. 243 ["When imperfect self-defense is at issue, the malice element of murder requires the People to show the absence of that circumstance beyond a reasonable doubt"].) "Thus, when there is substantial evidence to support the theory, the failure to instruct on [heat of passion] amounts to an incomplete instruction on an actual element of murder, namely malice." (*Schuller*, at pp. 243-244.) That form of

12

misinstruction qualifies as federal constitutional error subject to the harmless "'beyond a reasonable doubt' standard for evaluating prejudice" under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*Schuller*, at p. 260.)

In this context, the *Chapman* standard "compels the reviewing court to reverse the conviction unless it concludes that no 'rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the findings necessary to convict the defendant [absent the instructional error].'" (*Schuller*, *supra*, 15 Cal.5th at p. 244.) We reach that conclusion in this case: No rational juror who heard the evidence and made the findings reflected in the verdict could have had reasonable doubt that Espino was not acting in the heat of passion. In particular, the jury's finding that Espino committed attempted murder with premeditation and deliberation shows that the error was harmless beyond a reasonable doubt.

As relevant here, the instruction on the heat of passion theory of voluntary manslaughter states that the defendant attempted to kill someone in the heat of passion if the "attempted killing was a rash act done under the influence of intense emotion." (CALCRIM No. 603.) The instruction also states that the People have the burden of proving beyond a reasonable doubt that the defendant was not acting in the heat of passion. (*Ibid.*)

The court instructed the jury on premeditation and deliberation pursuant to CACLRIM No. 601. The court thus informed the jurors: "The defendant deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. [¶] The defendant acted with premeditation if he decided

13

to kill before completing the acts of attempted murder." The court further instructed the jury: "A decision to kill made rashly, impulsively, or without careful consideration of the choice or its consequences is not deliberate and premeditated." And the court instructed the jurors that the People had the burden of proving beyond a reasonable doubt that Espino attempted to kill with premeditation and deliberation.

In closing argument, the People summarized the evidence showing that Espino hit Father in the head with the hammer multiple times, hit Father with the five-pound stone, set a fire next to Father, and left him incapacitated. The People argued that those circumstances showed that the attempted killing was "not rash and impulsive" but was "cold, calculated." The People then argued: "Let's consider what a rash killing would look like, right, or a rash attempted murder. Maybe he would have stopped after the second strike with the hammer or the second strike with the first weapon, right? But every strike thereafter, he's thinking about it. He's willfully choosing to pick up a weapon, smash his father's head, pick up another weapon, and start a fire. It was cold and calculated."

After hearing all the evidence and argument, the jury found beyond a reasonable doubt that Espino attempted to kill with premeditation and deliberation. The jurors thus found beyond a reasonable doubt that he did not act "rashly, impulsively, or without careful consideration." (CALCRIM No. 601.) No rational juror who found beyond a reasonable doubt that Espino did not act rashly could have had reasonable doubt that he did not commit "a rash act." (CALCRIM No. 603.) The two findings are "manifestly inconsistent." (*People v. Wharton* (1991) 53 Cal.3d 522, 572 (*Wharton*); *Schuller, supra,*

14

15 Cal.5th at p. 265 (conc. opn. of Liu, J.) ["voluntary manslaughter based on heat of passion is 'manifestly inconsistent' with premeditation and deliberation"].)  On this record, the failure to instruct on the heat of passion theory of voluntary manslaughter was harmless beyond a reasonable doubt.  (*People v. Peau* (2015) 236 Cal.App.4th 823, 830-831 (*Peau*) [jury's finding of premeditation and deliberation rendered the failure to instruct on the heat of passion theory of voluntary manslaughter harmless beyond a reasonable doubt]; *People v. Wang* (2020) 46 Cal.App.5th 1055, 1071-1072 [same]; *People v. Franklin* (2018) 21 Cal.App.5th 881, 891-894 [jury's finding of premeditation and deliberation rendered the trial court's inconsistent instructions on heat of passion harmless beyond a reasonable doubt].)

Espino argues that under *People v. Berry* (1976) 18 Cal.3d 509 (*Berry*), we may find the error prejudicial.  "*Berry* held that the failure to give a requested heat-of-passion instruction was not rendered harmless just because the defendant was convicted of first degree murder, explaining, 'While the instructions made passing reference to heat of passion and provocation for the purpose of distinguishing between murder of the first and second degrees, such reference was casually made[,] [and] [t]here was no clear direction to the jury to consider the evidence of [the victim]'s course of provocatory conduct so as to determine whether [the] defendant, as an ordinary man of average disposition [citation] having been exposed to such conduct, was provoked into committing the homicide under a heat of passion.'"  (*Peau, supra*, 236 Cal.App.4th at p. 831, quoting *Berry*, at p. 518.)

But more recently in *Wharton*, our Supreme Court held that the trial court's erroneous instruction on the heat of passion theory of voluntary manslaughter was

15

rendered harmless by the jury's finding that the defendant committed murder with premeditation and deliberation. (*Wharton*, *supra*, 53 Cal.3d at p. 572.) The court reasoned: "This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct—and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction." (*Ibid.*)

At least two appellate courts have noted the apparent "tension" between *Berry* and *Wharton*, and they decided to follow *Wharton*. (*Peau*, *supra*, 236 Cal.App.4th at p. 831; *People v. Franklin* (2018) 21 Cal.App.5th 881, 892.) Those courts reconciled the two cases by concluding that *Berry*'s discussion concerned only "whether the error was harmless because the jury received some instruction on the concepts of heat of passion and provocation." (*Peau*, at p. 831; *Franklin*, at p. 894.) *Berry* did not even mention that the relevant form of "first degree murder must be willful, deliberate and premeditated." (*Peau*, at p. 831; *Franklin*, at p. 894.) By contrast, *Wharton*'s "more recent reasoning" directly addressed how premeditation and deliberation "'is manifestly inconsistent'" with the heat of passion theory, so that case was "on point." (*Peau*, at p. 831; *Franklin*, at p. 894.) We agree with those courts that *Wharton* is on point and supports our conclusion that the error in this case was harmless, and *Berry* does not foreclose that conclusion. (*Peau*, at pp. 831-832; *Franklin*, at pp. 893-894; but see *People v. Ramirez* (2010) 189 Cal.App.4th 1483, 1488 [without mentioning *Wharton*, relying on *Berry* to conclude that the failure to instruct "on heat of passion voluntary manslaughter is not rendered harmless by" a finding of premeditation and deliberation].)

In sum, the court erred by failing to instruct the jury on the heat of passion theory of attempted voluntary manslaughter, but the error was harmless beyond a reasonable doubt.

## II.     *Ineffective assistance and instruction on voluntary intoxication*

Espino argues that defense counsel rendered ineffective assistance by failing to request the jury instruction on voluntary intoxication, CALCRIM No. 625.  The argument lacks merit.

### A.     *Additional background*

CALCRIM No. 625 states that jurors may consider evidence of the defendant's voluntary intoxication only in deciding whether the defendant acted with intent to kill, premeditation and deliberation, or another specific intent required for the charged offense.  It further states that jurors "may not consider evidence of the defendant's voluntary intoxication for any other purpose."  (CALCRIM No. 625.)

At the hearing on jury instructions, defense counsel did not ask the court to instruct the jury on voluntary intoxication.  However, he did ask the court to give CALCRIM No. 3428, the similar jury instruction regarding mental impairment. CALCRIM No. 3428 states that jurors may consider evidence that the defendant suffered from a mental disease, defect, or disorder "for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime."  The court denied the request, ruling:  "[T]here is no evidence here from anybody that's qualified to give that evidence that the defendant

17

suffered from any mental disease or defect or disorder.  There's been no such evidence of that, other than what the defendant stated but was stricken from the record."[1]

In closing argument, defense counsel argued that Espino did not act with premeditation and deliberation, given that he did not remember the attack.  Counsel emphasized that in Espino's mind, he saw the devil and reacted.  Counsel also argued that Espino was "not aware of his conduct at the time he picked up whatever he picked up and struck his father."  Counsel suggested that "[w]hen you drink a lot," you do not always remember what happened.  He then argued:  "Who had excessive drugs?  Miguel Espino had excessive drugs.  Do you know that for a fact?  Yes, you do.  So what am I asking you?  I'm asking you to believe that as a result of habitual abuse of all the drugs he mentioned and the blue—I don't know the name of them.  The last one was fentanyl . . . . Crystal meth.  He became (descriptive sound).  It affected him.  It's realistic.  It's believable."

After the jury returned its verdict, defense counsel made an oral motion for new trial.  Counsel argued in part that he rendered ineffective assistance.  He asserted that after trial, he learned about "a condition called [a] blackout in which the defendant while he was on the stand said he does not remember."  Counsel suggested that he was ineffective because he "did not bring any competent witness or experts the way the

---

[1]     During direct examination, Espino stated that he was admitted to a mental institution at some point before the attack on Father.  The People objected and moved to strike that testimony, and the court granted the motion to strike.

People did," although he "did try to tell the jurors that quite often they may have experienced themselves or other people who drink, get drunk, and don't remember."[2]

B.    *Analysis*

"Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).)  Voluntary intoxication evidence therefore is relevant only for limited purposes.  With respect to imperfect self-defense, evidence of voluntary intoxication is not admissible "on the question of whether a defendant believed it necessary to act in self-defense." (*People v. Soto* (2018) 4 Cal.5th 968, 970.)  "'If you voluntarily choose to become intoxicated and then kill someone, you may not claim that you were so intoxicated you were unaware your victim posed no threat to you when you killed, although you may claim you were too intoxicated to intend to kill or premeditate or have the specific intent to commit some other felony.'" (*Id.* at pp. 978-979.)

"To demonstrate ineffective assistance of counsel, [the defendant] 'must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.'" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.)  "On direct appeal, a finding of deficient performance is warranted where '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory

---

[2]    We further discuss the motion for new trial in the following part.

19

explanation.' [Citation.] '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.'" (*Ibid.*)

Espino fails to establish deficient performance, because there is a conceivable tactical reason for counsel's failure to request the instruction on voluntary intoxication. Besides Espino's statements, there is no evidence about how the combination of PCP and marijuana would have affected him during the attack on Father. Espino said that his intoxication affected him in two ways. First, he could not remember many details of the attack. That is not relevant to any defense or any issue addressed by a voluntary intoxication instruction. But second, he thought that Father was trying to kill him because he was "drugged out of [his] mind." Similarly, he said that he was delusional and saw Father as the devil. The jury could have believed that testimony was relevant to Espino's self-defense theories—his drug-induced, delusional belief that Father was the devil and was trying to kill him led him to believe that he had to defend himself. That would, however, be a legally improper use of Espino's testimony, and the jury would have known that if it had been instructed on voluntary intoxication. Again, voluntary intoxication can be considered only as to the issues of specific intent, premeditation, deliberation, and express malice. It cannot be considered in determining whether the defendant believed that self-defense was necessary. Consequently, counsel could have made the reasonable tactical choice to have the jury remain ignorant of the law on voluntary intoxication so that the jury might (improperly) consider Espino's voluntary

20

intoxication testimony in support of his self-defense theories.  And the absence of the instruction did not prevent defense counsel from making any legally sound arguments to the jury.  There was nothing "hinder[ing] defense counsel from arguing that [Espino's] intoxication affected all the necessary mental states," including the required specific intents and premeditation and deliberation.  (*People v. Castillo* (1997) 16 Cal.4th 1009, 1017.)

Espino contends that there was no conceivable tactical reason for requesting the mental impairment instruction but not the voluntary intoxication instruction.  The argument fails because unlike voluntary intoxication, mental impairment can properly be considered in determining whether the defendant believed self-defense was necessary.  A defendant may present "evidence of mental disease, defect, or disorder to support a claim of unreasonable self-defense based on a mistake of fact."  (*People v. Elmore* (2014) 59 Cal.4th 121, 146.)  Thus, a "defendant who misjudges the external circumstances may show that mental disturbance contributed to the mistaken perception of a threat."  (*Ibid.*)  For these reasons, the mental impairment instruction did not have the negative consequences for the defense theories that the voluntary intoxication instruction would have had.

Espino also argues that the record confirms that counsel actually had no tactical reason for failing to request the instruction, because counsel admitted in his oral motion for new trial that he had made mistakes regarding voluntary intoxication.  Again, the argument is unpersuasive.  Counsel's argument for a new trial was that he erred by not

developing evidence regarding "a blackout," not that he erred by failing to request the voluntary intoxication instruction.

Even if Espino had established deficient performance, we would nevertheless conclude that he fails to show prejudice. Counsel's deficient performance is prejudicial if "there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301.) Espino asserts in a conclusory fashion that if the jurors had been instructed on voluntary intoxication, then it is likely that they would not have found that he acted with premeditation and deliberation or formed the specific intent necessary to commit aggravated mayhem, which is "the specific intent to cause a maiming injury." (*People v. Manibusan* (2013) 58 Cal.4th 40, 86.) We are not persuaded.

The evidence that Espino made a premeditated and deliberate choice to try to kill Father is particularly strong. The evidence shows that Espino struck Father repeatedly in the head with the claw end of a hammer and nearly severed Father's ear. The evidence also shows that he used a five-pound rock to strike Father. In addition, after bludgeoning and disabling Father, Espino built a pile of materials near Father, found a bottle of isopropyl alcohol, poured it on the pile, and set it on fire. The fire burned Father's shoulder before he was found. The prolonged nature of the attack and the use of multiple methods to try to kill Father amply show that Espino "had many opportunities to consider and reflect on his actions" and chose to continue with his decision to try to kill. (*People v. Streeter* (2012) 54 Cal.4th 205, 244.)

22

Similarly, the evidence that Espino intended to cause a maiming injury is strong. Again, Father's ear was nearly severed, and the area looked like minced meat, according to his medical records. There is no reasonable probability that the jurors would not have inferred an intent to cause the maiming injury from the evidence that Espino repeatedly struck Father's ear with the claw of a hammer to the point of nearly severing the ear.

In contrast to the strong evidence of Espino's specific intent, premeditation, and deliberation, there is no evidence from an expert witness that the drugs that he ingested would have prevented him from forming the required mental states. There is only Espino's self-serving testimony that he could not remember many details and that he thought Father was trying to kill him. But Espino was not a very credible witness. For instance, he claimed to remember that Father got mad at him, "started losing it," and wielded a knife, but he purported to be unable to remember his own attack on Father. However, in the voicemail to his mother shortly after his arrest, he remembered using the hammer and the stone. He also told officers inconsistent stories. He first said that he was never at the trailer and did not see Father, but he later said that he found Father disabled and the trailer on fire, and he left to find the perpetrator.

Given the strong evidence that Espino harbored all of the mental states found by the jury and the weak evidence concerning the effects of his intoxication, it is not reasonably probable that the instruction on voluntary intoxication would have led to a more favorable result.

23

In sum, Espino's ineffective assistance claim lacks merit. There is a conceivable tactical reason for defense counsel's failure to request the instruction on voluntary intoxication, and Espino fails to show that the omission prejudiced him.[3]

III.    *Motion for new trial*

Defense counsel moved for a new trial on several grounds, including his own ineffective assistance. Espino argues that the trial court erred by failing to conduct a sufficient inquiry into counsel's claim of ineffective assistance, and we therefore must remand for the court to conduct further inquiry. We disagree.

A.    *Additional background*

Defense counsel orally moved for a new trial. First, he argued that one or more jurors concealed a bias against him during voir dire. Second, he argued that the court improperly permitted the People to introduce prior acts evidence under Evidence Code section 1109. Third, he argued that the court should have excluded the second police interview with Espino. With respect to that interview, counsel asserted, "I felt I could have been slightly more prepared." Fourth, he argued that he rendered ineffective assistance by failing to develop evidence concerning "a condition called [a] blackout." Counsel said that he had recently learned of the condition from a crime novel, and he

---

[3]    Espino argues that his trial was rendered fundamentally unfair by the cumulative effect of (1) the failure to instruct on the heat of passion theory and (2) defense counsel's ineffective assistance. The argument fails because Espino has not shown deficient performance by defense counsel, so there are no "errors to cumulate." (*People v. Gonzalez* (2021) 12 Cal.5th 367, 417.) And assuming for the sake of argument that counsel's performance was deficient, we are not persuaded that the combination of claimed errors rendered Espino's trial fundamentally unfair. (*People v. McKinnon* (2011) 52 Cal.4th 610, 681.)

explained: "I did not bring any competent witness or experts the way the People did. The People were overly thoroughly, overly exceptional. They brought scientists. I brought nobody." Counsel then stated that he was "ineffective as an attorney. . . . I felt I was not as thorough, as alert."

The court asked defense counsel if he intended to file a written motion for new trial or whether he was prepared to proceed with his oral motion. The court thought that "at least portions of what [he] stated should have been in a noticed motion." Counsel stated that he did not intend to file a written motion and that he was prepared to proceed.

The court denied the motion for new trial. The court reasoned that there was no evidence of improper conduct by the jurors. Regarding admission of the prior acts evidence and the police interview, the court concluded that it did not err. The court did not mention defense counsel's claim of ineffective assistance but stated: "[I]f there's additional information or anything else that defense wants to bring up via a written motion, then I would be open to that, and that's why I was asking about that." Defense counsel responded that he had "no other issues to bring before the Court regarding this case, this trial."

B.     *Analysis*

A defendant may bring a nonstatutory motion for new trial on the basis of ineffective assistance of counsel. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582.) "[T]rial judges are particularly well suited to observe courtroom performance and to rule on the adequacy of counsel in criminal cases tried before them. [Citation.] Thus, in appropriate circumstances justice will be expedited by avoiding appellate review, or

25

habeas corpus proceedings, in favor of presenting the issue of counsel's effectiveness to the trial court as the basis of a motion for new trial." (*Ibid.*)

A conflict may arise when a defendant asks their trial counsel to argue counsel's own incompetence as a basis for a new trial. (*People v. Stewart* (1985) 171 Cal.App.3d 388, 391, disapproved on another ground by *People v. Smith* (1993) 6 Cal.4th 684, 694.) *Stewart* addressed that problem. (*Stewart*, at p. 391.) Defense counsel in that case followed his client's instruction to move for a new trial on the basis of counsel's incompetence, but the motion papers did not state why counsel was incompetent. (*Id.* at p. 393.) At the motion hearing, the trial court asked the defendant and counsel why they thought that counsel had acted incompetently, but both declined to say. (*Ibid.*) Counsel stated that he could not argue his own incompetence and asked the court to appoint a new attorney to represent the defendant for purposes of the motion. (*Ibid.*) The court did not appoint new counsel but held an in camera hearing with the defendant and counsel, and the defendant proffered two bases for counsel's claimed incompetence. (*Id.* at p. 394.) The trial court denied the motion for new trial. (*Ibid.*)

The *Stewart* court concluded that "where a defendant requests the substitution of new counsel after trial in order to assist in the preparation of a motion for new trial based on the inadequacy of trial counsel," the trial court must elicit from the defendant the reasons for the claim of inadequate representation, either in open court or at an in camera hearing. (*Stewart*, *supra*, 171 Cal.App.3d at p. 395.) *Stewart* relied on our Supreme Court's decision in *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). (*Stewart*, at p. 395; *Marsden*, at pp. 124-125 [when a defendant seeks to discharge their appointed

26

counsel because of inadequate representation and requests new counsel, the court must permit the defendant to explain the basis for their claim and relate specific examples of counsel's inadequacy].) *Stewart* reasoned that under "*Marsden,* a trial court cannot thoughtfully exercise its discretion in a matter such as this without listening to the defendant's reasons for requesting a change of attorneys. 'A trial judge is unable to intelligently deal with a defendant's request for substitution of attorneys [or for a new trial on the basis of trial counsel's incompetence] unless he is cognizant of the grounds which prompted the request.'" (*Stewart*, at p. 395.)

*Stewart* further held that if the claim of incompetence "is based upon acts or omissions that occurred at trial or the effect of which may be evaluated by what occurred at trial," then "the court may rule on the motion for new trial without substituting new counsel. If, on the other hand, the claim of incompetence relates to acts or omissions that did not occur at trial and cannot fairly be evaluated by what occurred at trial, then . . . the court must determine whether to substitute new counsel to develop the claim of incompetence." (*Stewart, supra,* 171 Cal.App.3d at p. 397.) *Stewart* concluded that the trial court erred by failing to inquire sufficiently into one of the bases that the defendant asserted for counsel's incompetence. (*Id.* at p. 398.) The appellate court therefore remanded the matter for the court to conduct that further inquiry and to determine whether the defendant had made a "colorable claim of ineffective assistance" warranting appointment of new counsel. (*Ibid.*)

Espino relies on *Stewart* and a case following it (*People v. Reed* (2010) 183 Cal.App.4th 1137, 1143-1145 (*Reed*)), but his argument that we must remand for a

27

*Stewart* inquiry lacks merit. *Stewart* held that the court must investigate the claim of ineffective assistance because the defendant requested new counsel for purposes of the motion for new trial. (*Stewart*, *supra*, 171 Cal.App.3d at pp. 395-396.) The situation was analogous to a *Marsden* motion in which a defendant requests that the court appoint new counsel.

But the same court that decided *Stewart* later clarified that when neither the defendant nor defense counsel has requested the appointment of new counsel for purposes of the new trial motion, the court has "no duty to make a *Stewart* inquiry." (*People v. Gay* (1990) 221 Cal.App.3d 1065, 1071.) "[A]bsent a request the court appoint substitute counsel to prepare and present a motion for new trial based on inadequate representation, the *Stewart* procedures concerning appointment of such counsel are not required." (*Ibid*.) Rather, when the defense does "not request substitute counsel," the court is "only required to consider and rule on defendant's motion for new trial." (*Ibid.*)

That was all that was required in this case. Defense counsel, who was retained, argued that he was ineffective, and he set forth reasons for that claim of ineffective assistance. Counsel did not request that the court appoint new counsel to prepare the motion for new trial, and Espino did not request substitution of counsel either. The court gave defense counsel ample opportunity to present his motion for new trial, and the court asked more than once whether counsel wanted to file a written motion. Counsel declined the opportunity to present any further arguments or evidence, and he never argued that the court had a duty to inquire further into his claims. The court's only obligation at that

28

point was to consider and rule on the motion as presented by defense counsel. Espino's argument that we must remand for a further inquiry therefore fails.

Espino's reliance on *Reed* does not change our conclusion. The *Reed* defendant made two unsuccessful *Marsden* motions asking the court to discharge his appointed counsel. (*Reed*, *supra*, 183 Cal.App.4th at pp. 1140-1141.) Later, at the sentencing hearing, the defendant asked his counsel to move for a new trial on the basis of counsel's incompetence. (*Id.* at p. 1142.) Defense counsel told the court and the defendant that she could not make that motion and that the defendant was better off having appellate counsel argue her ineffective assistance. (*Ibid.*) The trial court agreed, did not make any inquiry of the defendant at all, and proceeded with sentencing. (*Id.* at pp. 1142-1143.) *Reed* held that the court erred by failing to make any inquiry into the basis for the defendant's claim of incompetent counsel. (*Id.* at pp. 1145, 1148.) The defendant's "expressed desire to pursue a motion for new trial based on counsel's incompetence, the fact that defense counsel said, 'I cannot make it for him,' and the context of [his] prior unsuccessful *Marsden* motions, made it sufficiently clear that [he] was in fact requesting substitute counsel to pursue the motion for new trial." (*Id.* at pp. 1145-1146.) The trial court accordingly had the "'imperative duty' to make the requisite *Marsden* inquiries." (*Id.* at p. 1148.)

Espino's case is unlike *Reed*. There is no indication that Espino was making a de facto request for new counsel, that counsel refused to argue his own ineffective assistance, or that the court refused to hear the basis for the ineffective assistance claim.

29

For all of these reasons, the court did not err by failing to inquire further into defense counsel's claim of ineffective assistance in connection with the motion for new trial. A remand for that purpose is not warranted.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.

30